**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KOURTNEY PEARSON<br><br>Plaintiff,<br><br>v.<br><br>KASHYAP P. PATEL et al.<br><br>Defendants. | * * * * * * * * * * | Civil Action No: 26-00509 (RJL)<br><br>**JURY TRIAL DEMANDED** |

* * * * * * * * * * * * *

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Kourtney Pearson ("Ms. Pearson") faithfully dedicated nearly two decades of her life as an employee of the United States Government, all of which was in the service of the Defendant Federal Bureau of Investigation ("Defendant FBI"). On February 2, 2026, she was unlawfully fired by the FBI's Director Defendant Kashyap Patel ("Defendant Director Patel") under the guise of the President's Article II authority. But Defendant Director Patel has no constitutional, statutory or regulatory authority under Article II to take such action, nor can he factually or legally identify any delegation by the President for him to act as a surrogate and terminate Ms. Pearson.

The question of Defendant Director Patel's Article II authority is the starting point of the current dispute before the Court, and it should be viewed as the ending point of the first stage of this litigation. None of the other issues that are raised by the Defendants' Motion to Dismiss need to be addressed at this time and can be denied without prejudice as moot. Because Defendant Director Patel lacked legal authority to terminate Ms. Pearson, that personnel action must be deemed null and void as a matter of law. She must be immediately reinstated and provided with appropriate backpay (as well as reconciliation of her leave and retirement credit

and other personnel modifications that would apply to her change in status). Whether the Defendants can then properly and lawfully terminate her pursuant to applicable FBI regulations and policies, and consistent with all the due process protections that are supposed to be afforded an FBI employee, will be left to another day to litigate.

## FACTUAL AND PROCEDURAL BACKGROUND

As is well settled, at the motion to dismiss stage the factual allegations in Ms. Pearson's Complaint are taken as true. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). But given this filing also serves to support a Cross-Motion for Partial Summary Judgment on the first (*Ultra Vires* In Violation Of Constitutional Authority) and second (*Ultra Vires* In Violation Of Statutory Authority) causes of action, Ms. Pearson will therefore set forth the relevant facts for consideration on those two counts only. *See* Statement of Material Facts Not in Dispute at 1-3.

Ms. Pearson started working for the Defendant FBI" in 2008, just a year after she graduated from college and completed a Master's degree. Her last position with Defendant FBI was as a Senior Management and Program Analyst within the Human Resources Division ("HRD"). This position was a GS-14, step 6. She was also serving in an Acting Supervisory Program Manager position within the Security Division ("SecD"). In neither of these positions was she supervised by any principal officers within Defendant FBI or Department of Justice. Declaration of Kourtney Pearson at ¶3 (dated July 13, 2026)("Pearson Decl."), attached at Exhibit "1". Other than the circumstances associated with this litigation, she never had a disciplinary issue in nearly two decades of federal service. *Id*. at ¶4.

On March 16, 2025, Ms. Pearson was unexpectedly placed on administrative leave by HRD executive management. She was never provided with prior notice, justification, or any

performance-based rationale. When she asked why this action was being taken, she was told via e-mail by then HRD Assistant Director Miriam Coakley that it was due to "mission need" and that she would receive no further explanation. Her immediate supervisors informed me that they were not involved in the decision. *Id*. at ¶5. From March 16, 2025, to March 27, 2025, she remained on administrative leave and was never once provided any substantive information concerning why. She was then assigned to SecD and reported there on March 31, 2025. *Id*. at ¶6.

On Monday, February 2, 2026, she was provided with a memorandum dated Friday, January 30, 2026, that was signed by Defendant Director Patel and summarily terminated her employment. *Id*. at ¶7. The memo reads, in relevant part:

> This document provides official notice that you are being summarily dismissed from your position at the Federal Bureau of Investigation, and removed from the federal service, under my authority as the FBI Director, effective immediately.
>
> You have demonstrated unprofessional conduct, and pursuant to Article II of the United States Constitution and the laws of the United States, your employment with the Federal Bureau of Investigation is hereby terminated.

Pearson Decl., Exhibit "1-A".

She asked Acting Assistant Director Joshua Stone, who provided her with the memo, for an explanation concerning her termination and was simply told there was no further information available. *Id*. at ¶8. At no time was Ms. Pearson ever provided notice nor made aware of any conduct that may have served as a basis for her termination. To this day, she has no idea what "unprofessional conduct" she allegedly engaged in, and she was never afforded an opportunity to address this accusation through any internal FBI due process procedures. *Id*. at ¶9.

Since January 20, 2025, Ms. Pearson is not the only FBI employee who has been terminated by Defendant Director Patel via an Article II memorandum. Dozens of similar terminations have occurred. Declaration of Mark S. Zaid, Esq. at ¶6 (dated July 15, 2026)("Zaid Decl."), attached

at Exhibit "2"). Some of these have also resulted in litigation. *Id*. at ¶¶4-5. In an attempt to undermine legal challenges brought by some of these terminated employees, months after being terminated the Attorney General of the United States issued a new memorandum that purports to ratify and affirm Defendant Director Patel's action. *Id*. at ¶7; Exhibit "2-A". Ms. Pearson never received any such follow-up memorandum from the Attorney General. Pearson Decl. at ¶10; Zaid Decl. at ¶7.

This lawsuit was filed by Ms. Pearson on February 17, 2026. Dkt. 1. The Defendants initially filed a Motion to Dismiss on May 20, 2026. Dkt. 7. Ms. Pearson, however, filed a First Amended Complaint as a matter of right on June 3, 2026. Dkts. 9, 10. The current Motion to Dismiss was then filed by the Defendants on July 1, 2026. Dkt. 13.

## ARGUMENT

The Defendants hope to frame this lawsuit in a manner that pre-January 20, 2025, would have likely resulted in a court ruling that dismissed her claims because she is, as a non-preference FBI employee, prohibited under the Civil Service Reform Act ("CSRA") from bringing a challenge of her termination to the Merit System Protection Board ("MSPB"). *See* Memorandum in Support of Defendant's Motion to Dismiss at 4-8 (filed July 1, 2026)(Dkt. 13)(Defs' Memo"). Though this issue of preclusion and the extent to which this Court can nonetheless exercise jurisdiction over Ms. Pearson's constitutional claims are discussed herein, these are issues best left to be addressed, if ever at all, later in this litigation.

Instead, this Court should respectfully first address, and grant summary judgment for Ms. Pearson on, the narrow question of whether an FBI Director possesses constitutional authority to summarily terminate employees under Article II. Should that answer be – as a matter of law – in

the negative, none of the other issues or arguments addressed by the Defendants are ripe for adjudication and their Motion to Dismiss should be denied without prejudice as moot.

But even if this Court were to determine Defendant Director Patel did possess Article II authority, it still retains jurisdiction because the CSRA scheme does not touch upon Article II terminations. Moreover, this Court also can similarly exercise jurisdiction over Ms. Pearson's constitutional claims notwithstanding the application of the CSRA, as some of its sister courts have so held. With that in mind, the Defendants' Motion to Dismiss should be respectfully denied as well.

## I. LEGAL STANDARDS OF REVIEW

### A. Summary Judgment

Pursuant to Federal Rules of Civil Procedure Rule 56, summary judgment should be awarded to a movant if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the appropriateness of summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006), accepting the non-moving party's evidence as true, and draw "all justifiable inferences" in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Summary judgment should only be awarded to a movant if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are "irrelevant or unnecessary" do not affect the summary judgment

determination. *Anderson*, 477 U.S. at 248. An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

**B. Fed. Rule Civ. Procedure 12(b)(1)**

When a defendant brings a motion under Fed. R. Civ. P. 12(b)(1), this presents a "threshold challenge" to the court's jurisdiction. *Metro. Washington Chapter v. District of Columbia*, 57 F. Supp. 3d 1, 13 (D.D.C. 2014). A plaintiff can overcome this by "establishing jurisdiction by a preponderance of the evidence." *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011)(*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "In reviewing a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Rann v. Chao,* 154 F. Supp. 2d 61, 64 (D.D.C. 2001). The Court, in its analysis, "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000).

**C. Fed. Rule Civ. Procedure 12(b)(6)**

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint[.]" *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Such a motion should only be granted if it appears beyond doubt that a plaintiff will be unable to prove any set of facts that support his claim entitling him to relief. *See Tabb v. District of Columbia*, 477 F. Supp. 2d 185, 188 (D.D.C. 2007)(*citing Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 325 (1991)). A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(cleaned up). Moreover, when ruling on a motion to

dismiss pursuant to Rule 12(b)(6), "a judge must accept as true all of the factual allegations contained in the complaint." *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 45 (D.D.C. 2017)(*citing Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009)). "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012)(*quoting Schuler v. United States*, 617 F. 2d 605, 608 (D.C. Cir. 1979)); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)(court must also give plaintiff "benefit of all inferences that can be derived from the facts alleged."). Taken as true, a complaint's factual allegations need only rise above the speculative *level. Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is "plausible on its face" when the facts pled in the complaint allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 570).

## II. THE FBI DIRECTOR DOES NOT POSSESS ARTICLE II AUTHORITY TO SUMMARILY DISMISS EMPLOYEES AND MS. PEARSON IS ENTITLED TO SUMMARY JUDGMENT ON THIS ISSUE

The Defendants spend a mere two pages (not even 10% of their brief) to address the most significant legal issue they are facing. In doing so, all they muster are generic conclusory assertions that "[u]nder Article II, the President has authority to remove Executive Branch employees, and the FBI Director, as a subordinate of the President, can exercise such authority on the President's behalf." Defs' Memo at 8. But the Defendants fail to cite to even one case that has held this to be true in a manner that parallels this matter. Yes, of course, there are cases that logically apply the theme that Presidents are unable to render every decision reached each day in the federal government and it falls through delegation to subordinates to pursue and implement

an administration's policies. *See Trump v. Slaughter*, 2026 U.S. LEXIS 2877, *18 (U.S. June 29, 2026)("To vest 'the whole executive power' in just one person was not to suggest that he could execute the laws alone and unaided." (citation omitted)). But, as discussed further below, that is not the issue that is presented here.

To be fair, so far as the undersigned are aware, it is not surprising that the Defendants failed to identify any relevant case law, much less a precedent, as to the question of whether an FBI Director – as a matter of their own subordinate judgment and without any instruction from those above – can exercise the President's Article II authority. It is truly a case of first impression. The Defendants' reliance, however, on the recent Supreme Court decision in *Slaughter*, which dealt with the termination of Commissioners on the Federal Trade Commission, does not answer this important question. There the Court made it very clear that only the narrow question of the President's Article II authority to terminate superior officers was addressed. *See e.g. id.*, at *44 ("Nor do we determine the fate of officials not before us."). Whether the President could exercise authority under Article II to personally terminate inferior officers or employees, such as Ms. Pearson, is a question for another day.

There are, however, several challenges working their way through the Courts right now in multiple jurisdictions that address the Article II authority of either the President or his subordinates. *See e.g. Comans v. Executive Office of the President et al.*, Civil Action No. 25-1237-MSN-WE (E.D.V.A.)(memorandum terminating Federal Emergency Management Agency official "at the direction of the President"); *Driscoll et. al. v. Patel et al.*, Civil Action No. 25-3109 (D.D.C.)(JMC)(termination of FBI senior officials by Director); *Jane Does #1-9, et. al. v. Patel et al*. Civil Action No. 25-4258 (D.D.C.)(TNM)(termination of numerous FBI personnel by Director); *Jablonski v. Patel et. al*. Civil Action No. 26-449 (D.D.C.)(JMC)(termination of FBI

analyst by Director); *John Doe #1 et al. v. Patel et al.*, Civil Action No. 26-0959 (D.D.C.)(JMC) (termination of FBI employees by Director); *Comey v. Department of Justice et al.*, Civil Action No. 25-7625 (S.D.N.Y.)(JMF)(termination of federal prosecutor by Attorney General); *Gordon v. EOP*, Civil Action No. 25-2409 (D.D.C.)(JMC)(termination of three Department of Justice employees by Attorney General); *Schnitt v. Bondi*, Civil Action No. 25-4111 (D.D.C.)(CRC) (termination of DOJ employee by Attorney General). Most of these cases are either awaiting rulings or still being briefed, but none have yet addressed the question at hand. To the degree there have been rulings in *Comans* and *Comey*, as discussed further below, neither case pertained to Defendant FBI or ruled on the lawfulness of the exercise of Article II authority but they do directly support Ms. Pearson's argument that the CSRA does not serve as an obstacle to this Court accepting jurisdiction, as discussed *infra* in Section III.

### A. Ms. Pearson Is Neither A Superior Or Inferior Officer And Is Clearly An Employee Who Cannot Be Summarily Terminated Under Article II Authority

The President's removal authority is principally grounded in the Appointments Clause. U.S. Const. art. II, § 2, cl. 2. For purposes of that clause, "federal workers fall into three categories: (i) principal officers, who must be appointed by the President with the advice and consent of the Senate; (ii) inferior officers, who can be appointed by the President, the head of a department, or a court of law; and (iii) non-officer employees, whose appointments are unaddressed (and thus unconstrained) by the Clause." *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1096 (D.C. Cir. 2021).

Although the Defendants spend no effort trying to distinguish or explain the differences between these three categories, they do seemingly recognize they exist by at least referencing them. Defs' Memo at 9. Which category Ms. Pearson falls into, however, is a relevant issue for this Court and merits discussion. An officer is "inferior" rather than "principal" "if her work is

directed and supervised at some level by principal officers," such as the Attorney General and others who report directly to the President. *Fleming*, 987 F.3d at 1103 (citation omitted); *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025). An "officer" exercises "significant authority pursuant to" federal law, whereas a mere "employee . . . does not." *Id*. at 759 (citation omitted). In their arguments, the Defendants do acknowledge that the Supreme Court deferred whether removal authority extends to "lesser functionaries subordinate to officers of the United States." *Id. citing Free Enterprise Fund v. Pub. Co. Acct. Oversight Board*, 561 U.S. 477, 513-14 (2010). But it is their bold conclusion, notwithstanding the lack of precedent, that guides this dispute as they seek to have this Court go further than any has before; namely: "the President has authority under Article II to remove Executive Branch *employees*, and his subordinates can exercise that authority on the President's behalf. Applied to the facts of this case, Patel, as FBI Director, had authority under Article II to remove Plaintiff, as an Executive Branch *employee*." Defs' Memo at 10 (emphasis added).[1]

To begin, there can be no factual or legal dispute that Ms. Pearson is a "non-officer" employee. She was a GS-14, step 6, and was not supervised at any level by a principal officer. Pearson Decl. at ¶3. It would appear by the language utilized by the Defendants above to describe the scope of Defendant Director Patel's power, they agree. Yet, if so, precedent suggests that not even the President can effectuate her summary removal pursuant to Article II, but again those are not the facts or issue here and can be left for another dispute. Nonetheless, for proper

[1] In analyzing the Defendants' logic, a valid question must be considered: where would the scope of their premise end? Could the FBI's Deputy Director fire someone who is their subordinate? How about a GS-15 Section Chief or Special-Agent-In-Charge for those employees underneath them? Could Ms. Pearson, as a GS-14, fire any employee she supervised simply because she believed she was fulfilling the authority of the President?

context and background, it may still be helpful to analyze the overall concept of Article II authority, including that of the President.

Presidential power to remove executive officers is incidental to the power to appoint. *Myers v. United States*, 272 U.S. 52, 119 (1926); *Braidwood Mgmt., Inc.*, 606 U.S. at 763. When the President appoints an officer, the President ordinarily retains authority to remove that officer. *Myers,* 272 U.S. at 119. But Article II draws a critical distinction when appointment authority does not reside with the President. The Constitution expressly authorizes Congress to vest the appointment of inferior officers "by Law" in the "President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2. When Congress exercises that authority and vests appointment power in a department head — as it has done here — the Constitution permits Congress to define the conditions under which those officers may be removed. The Supreme Court settled this rule nearly 150 years ago in *United States v. Perkins*, 116 U.S. 483, 485 (1886).

In *Perkins*, the Court stated there is "no doubt that when [C]ongress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest." On that basis, it upheld a statute providing that an inferior officer appointed by the Secretary of the Navy could be dismissed only pursuant to court-martial. *Id*. Congress's ability was solidified to "limit and restrict the power of removal" of "inferior officers" appointed by heads of agencies "as [Congress] deems best for the public interest." *Id*. The Supreme Court explained that Congress's authority flows from the Appointments Clause, under which "Congress may by Law vest the Appointment of . . . inferior Officers, as they think proper, . . . in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The Constitution's grant of "authority" to Congress to "vest" appointment also "implies authority

to limit, restrict, and regulate . . . removal." *Perkins*, 116 U.S. at 485; *see also Myers*, 272 U.S. at 161 (same).

A century later, in *Morrison v. Olson*, 487 U.S. 654 (1988), the Supreme Court confirmed that where "Congress ha[s] chosen to vest the appointment of 'inferior' executive officials in the head of a department," there is no "specific constitutional impediment to congressionally imposed restrictions on the President's removal powers." *Id*. at 689 n.27 (citation omitted). The Court upheld the constitutionality of a statute providing "good-cause tenure protection" to an "independent counsel appointed to investigate and prosecute particular alleged crimes by highranking Government officials" — an "inferior officer" the Court described as "[having] limited jurisdiction and tenure" and lacking policymaking or significant administrative authority." *Seila Law LLC v. CFPB*, 591 U.S. 197, 218 (2020)(*quoting Morrison*, 487 U.S. at 691).

Notably, Justice Scalia — an ardent advocate of the Article II removal power — agreed in *Morrison* that the President lacks "plenary power to remove inferior officers." 487 U.S. at 724 n.4 (Scalia, J., dissenting). He explained that the President "retains control over the executive branch" when inferior officers are "removable for cause" because "cause" includes "the failure to accept supervision," and inferior officers' politically accountable superiors — principal officers — are removable at will. *Id*. Thus, although Article II "generally" grants the President expansive authority to remove executive officers, *Seila Law*, 591 U.S. at 213, the Supreme Court has repeatedly "left in place" the exception for inferior officers as recognized in *Perkins* and *Morrison*. *Id*. at 215, 217 (emphasis omitted).[2]

---

[2] Whatever the reasoning that led to the creation of this exception, this Court must follow *Perkins* and *Morrison* unless and until the Supreme Court overrules them. *See Rodriguez de Quijas v.*
(Continued…)

Based on this case law, it would be more than reasonable to conclude Congress may also regulate the removal of lower-level civil servants, such as Ms. Pearson, who do not rise to the level of "inferior officers." *See, e.g., Free Enterprise Fund*, 561 U.S. at 507 (striking down "novel" dual layer of removal protections for officers but emphasizing "[n]othing in our opinion . . . should be read to cast doubt on the use of . . . the civil service system"); *Fleming*, 987 F.3d at 1096 (nonofficer employees are "unaddressed (and thus unconstrained)" by Appointments Clause). *See also Lucia v. SEC*, 585 U.S. 237, 245-51 (2018)(analyzing differences between officers and employees).

None of the arguments above were directly addressed, much less contradicted, by *Slaughter*. While the Supreme Court made it expressly clear that *Slaughter*, 2026 U.S. LEXIS 2877, *10, overruled whatever was left of *Humphrey's Executor v. United States*, 295 U. S. 602 (1935), there is no indication that it modified the rulings in *Perkins*, *Morrison*, *Free Enterprise*, or *Seila Law*, all of which Ms. Pearson relies upon. Indeed, the majority did not even mention *Perkins* at all. *See Slaughter*, 2026 U.S. LEXIS 2877, *103 (Sotomayor, J., dissenting)(highlighting majority ignored *Perkins*).

Thus, given Ms. Pearson, as a non-officer employee, could not be terminated under Article II by the President, she most certainly could not be terminated under that same authority by Defendant Director Patel.

---

(Continued…)
*Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). The Court's most recent decision in *Slaughter* which explicitly addressed the President's Article II authority, as noted herein, definitely did not. Thus, *Perkins* and *Morrison* remain good law.

### B. The Attorney General's Ratification And Affirmation Of Certain FBI Article II Terminations By Defendant Director Patel Concedes A Lack Of Authority

Beyond the strength standing alone of Ms. Pearson's argument that Defendant Director Patel lacks Article II authority, it would appear the Defendants themselves have concerns, although the evidence for this premise was not addressed by their Motion. As some of the FBI Article II lawsuits gained steam, notably *Driscoll* and *Jane Does #1-9*, the Defendants took an extraordinary step that reflects a recognition of the weakness, if not outright concession, that their argument that Defendant Director Patel possesses Article II authority must fail. By Memorandum dated February 5, 2026, and which was filed on the public record in both *Driscoll* and *Jane Does #1-9*, the Attorney General expressly ratified and affirmed Defendant Director Patel's termination decisions for those individuals. Exhibit 2-A; *See Driscoll*, Dkt. 31-1 (filed March 6, 2026); *Jane Does #1-9*, Dkt. 14-2 (filed February 6, 2026). Presumably, this was an attempt to undermine the viability of Plaintiffs' legal argument that Defendant Director Patel lacked such authority and instead place the decision in the hands of the Attorney General as the Department head and someone directly responsive to the President. Otherwise, if the Defendants' arguments in this case are correct, why else take this upward step? Notably, Ms. Pearson has never been notified that the Attorney General has similarly ratified or affirmed her termination. Pearson Decl. at ¶10; Zaid Decl. at ¶7.

#### *1. Department of Justice Precedent Supports Ms. Pearson's Argument That Defendant Director Patel Could Not Have Been Delegated Any Article II Authority*

In fact, this Court need only look to the Department of Justice, the parent component of Defendant FBI, for the conclusion that Article II removal authority cannot be delegated to officials beneath Department heads (hence why the Attorney General intervened as described

above). The Office of Legal Counsel issued an opinion not even seven years ago that addressed this very issue:

> We have long advised, for instance, that the President alone may appoint officers by and with the advice and consent of the Senate. *See* Military Appointments, 29 Op. O.L.C. at 134–35. Congress may authorize the President to delegate to department heads the authority to appoint inferior officers who do not require Senate confirmation, because the Appointments Clause allows Congress to give that authority to department heads. See id.; Delegation of the President's Power to Appoint Members of the National Ocean Research Leadership Council, 21 Op. O.L.C. 38, 39 (1997). But the President's constitutionally assigned authority to appoint officers subject to the Senate's advice and consent is not delegable. *See* Military Appointments, 29 Op. O.L.C. at 134–35.

Appointment & Removal of Fed. Reserve. Bank Members of the Fed. Open Mkt. Comm., 43 Op. O.L.C. 263, 281 (2019), 2019 WL 11594453, at *12-13 & n.8, at *https://www.justice.gov/olc/file/1349721/dl*. The legal opinion importantly continued to state:

> Those same principles of political accountability apply to the power of a department head to remove inferior officers. When it comes to the supervision of an officer within the Executive Branch, the removal power is perhaps even more significant than the appointment authority. *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 726 (1986) ("Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey." (internal quotation marks omitted)). Accordingly, we have advised that the *authority to remove inferior officers may not be delegated to an agency official other than the department head, or another official constitutionally competent to appoint that officer in the first place.* Although, unlike the power to appoint officers, the power of removal is not expressly enumerated in the Constitution, that power is frequently treated as a necessary correlate to the power to appoint. For example, we have long maintained that the President's power to remove officials appointed by and with the advice and consent of the Senate cannot be assigned to another official just as his appointment power may not be.

43 Op. O.L.C. at 282 (emphasis added). "We have conceived of both the power to appoint and the power to remove such officers as being among the nondelegable authorities 'prescribed by the Constitution.' *Id*. at 283, *citing* Centralizing Border Control Policy Under the Supervision of

the Attorney General, 26 Op. O.L.C. 22, 24–25 (2002). If the President's removal power cannot be delegated to the FBI Director to remove inferior officers, then that authority most certainly cannot be delegated to terminate regular employees such as Ms. Pearson either.

This Office of Legal Counsel pronouncement should be viewed as binding upon the Defendants and serve as a guide to this Court for a ruling in favor of Ms. Pearson. That is how the Department of Justice views the situation. It recently argued to the MSPB in an Article II case that OLC opinions are binding. *Jackler and Jaroch Consolidation v. DOJ et al.*, 2026 M.S.P.B. 3, at ¶12 (March 20, 2026).[3] *See also Dist. of Columbia v. Trump*, 315 F. Supp. 3d 875, 884 n.16 (D. Md. 2018)("[OLC] opinions are entitled to considerable weight because they "reflect[] the legal position of the executive branch" and "provid[e] binding interpretive guidance for executive agencies.")(*quoting United States v. Arizona*, 641 F.3d 339, 385 n.16 (9th Cir. 2011)(Bea, J., concurring)); *but see Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 922 F.3d 480, 486 (D.C. Cir. 2019)(distinguishing where OLC opinions have not been adopted by individual agencies as the "working law" of the agency).

Unlike in some of the other cases, such as *Coman*, the President did not direct any communication to Ms. Pearson as an FBI employee. Nor did Defendant Director Patel's Termination Letter state he was acting on behalf of the President. Instead, the termination decision was issued "under my authority as FBI Director." FAC, ¶15; Pearson Decl. at ¶7; Exhibit 1-A. Since Defendant Director Patel could not have been legally delegated Article II authority from the President, and the Attorney General has not ratified or affirmed the

[3] The Board in *Jackler* declined to resolve the question of whether the OLC Opinion was binding upon it, as it was able to resolve the dispute without doing so. *See id*., 2026 M.S.P.B., at ¶13

termination (which Ms. Pearson does not concede would convey any level of legitimacy), Ms. Pearson is entitled to summary judgment on this issue as a matter of law.[4]

Therefore, Ms. Pearson's termination should be held null and void and she is entitled to be reinstated back to the position she held before being unlawfully fired on January 30, 2026, receive appropriate backpay and all applicable benefits that arise therefrom. With Ms. Pearson's termination rescinded, there is nothing left for this Court to adjudicate and the Defendants' Motion to Dismiss, which addresses the remaining five claims that comprise Ms. Pearson's First Amended Complaint, should respectfully be denied without prejudice as moot.

## III. ARTICLE II TERMINATIONS FALL OUTSIDE OF THE CSRA AND JURISDICTION REMAINS WITH THIS COURT

Even if Defendant Director Patel is recognized as possessing delegated Article II authority, this Court still possesses jurisdiction to hear Ms. Pearson's claims and the Defendants' Motion to Dismiss should respectfully be denied.

The Defendants characterize Pearson's argument that her termination under Article II authority falls outside the CSRA has one made in "passing" and that she failed to expand on it

---

[4] Conceivably, the Defendants could argue that Defendant Director Patel could have simply summarily dismissed Ms. Pearson in reliance on the FBI's own internal disciplinary policies, *see Langemen v. Garland*, 88 F.4th 289 (D.C. Cir. 2023)(discussed *infra* at Section IV(A)), and that whichever authority was relied upon is a distinction without a difference. That would be analogous to stating it was still appropriate to have executed an individual who was falsely convicted of a specific crime because it was also discovered they had committed some other crime for which they had not yet been prosecuted. Facts matter. The law matters. Defendant Director Patel specifically and solely stated he was using his "authority as the FBI Director … pursuant to Article II of the United States Constitution." Pearson Decl., Exhibit "1-A". And while the termination memorandum also refers to the "laws of the United States", *id*., which is the same text apparently used in many, if not all, of the other FBI Article II terminations, at no time in any of these cases have the Defendants argued that "the laws of the United States" was a reference to the CSRA or contend that any of the individuals fired was "for such cause as will promote the efficiency of the service." *See Comey*, 2026 U.S. Dist. LEXIS 92589, *7 fn.8. As the 16th-century French proverb states "comme on faist son lict, on le treuve" (as one makes his bed, so he finds it).

within her Amended Complaint. Defs' Memo at 10. Their interpretative speculation is that Pearson believes "the CSRA does not preclude her constitutional claims". *Id*. That argument assumes this litigation is a garden variety claim brought pre-January 20, 2025, and the CSRA, which admittedly has a recognized carve-out for FBI employees such as Ms. Pearson, applies in the first place. *See e.g.*, *Lamb v. Holder*, 82 F. Supp. 3d 416, 422 (D.D.C. 2015)(*citing* 5 U.S.C. § 7511(b)(8) and finding it "exclude[es] employees of the FBI from [the CSRA's] subchapter concerning removal"); Defs' Memo at 5 (citing cases). Respectfully, when it comes to Article II summary terminations, it does not.[5]

The only two courts that are known to have addressed this specific issue post-January 20, 2025, ruled in favor of the terminated employee and against the government. *See Comans*, 2026 U.S. Dist. LEXIS 93532, *4-5 (Apr. 15, 2026, E.D.V.A.)("Plaintiff's due process claims are not channeled away from this Court. In fact, jurisdiction in federal district court, and not the MSPB, is mandatory."); *Comey*, 2026 U.S. Dist. LEXIS 92589, *2 (Apr. 28, 2026, S.D.N.Y.) ("the Court concludes that Comey's case does not fall within the purview of the CSRA's scheme because she was fired pursuant to Article II of the Constitution, not pursuant to the CSRA itself.").

---

[5] Before this current administration assumed power, summary terminations at the FBI were uncommon, though they could occur and were even seen to be increasing. In 2021, the Department of Justice's Office of the Inspector General published a report on Defendant FBI's misconduct investigations process and noted that for decades summary dismissal was reserved for "extraordinary cases 'where the safety of the public, our fellow employees, national security interests or other compelling considerations may be at stake.'" "Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations," 21-127, at 15 (2021), available at *https://oig.justice.gov/sites/default/files/reports/21-127.pdf* ("DOJ OIG ROI"); FAC, ¶29. Reliance on Article II authority was unheard of for any type of termination, which is why there is absolutely no mention of it in the DOJ OIG ROI. In fact, the undersigned signatory counsel has never encountered or had even heard of one in over thirty years of practice, which regularly involves Defendant FBI and its personnel, until 2025. Zaid Decl. at ¶6.

In *Comans*, which involves the Article II termination of the former Chief Financial Officer of the Federal Emergency Management Agency (and who is represented by the undersigned), the Hon. Michael S. Nachmanoff noted "the threshold question is whether the agency order at issue falls within the relevant statutory review scheme". *Comans*, 2026 U.S. Dist. LEXIS 93532, *8 (*quoting Union Pac. R.R. v. U.S. R.R. Retirement Bd.*, 162 F. 4th 908, 914 (8th Cir. 2025)). *See Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 185 (2023)("a statutory review scheme . . . does not necessarily extend to every claim concerning agency action"); *Worthington v. United States*, 168 F. 3d 24, 26 (Fed. Cir. 1999)("The CSRA, by its terms, however, does not encompass every adverse personnel action against a federal employee."). "To determine the scope of the [CSRA's] special statutory review provisions, we look to the text of [the] statute[], taking into account 'both the specific context in which language is used and the broader context of the statute as a whole.'" *Union Pac. R.R.*, 162 F. 4th at 915.

Two weeks after Judge Nachmanoff ruled in *Comans*, the Hon. Jesse M. Furman issued his opinion in the *Comey* matter. Maureen Comey was a well-respected experienced Assistant U.S. Attorney in the Southern District of New York whose likely only "crime" was being the daughter of the former FBI Director James Comey. For that, she was terminated pursuant to Article II by the Attorney General. As with *Comans*, Judge Furman rejected the government's arguments and accepted jurisdiction because after "reviewing the text, structure, and purposes of the CSRA, the Court does not discern a congressional intent to channel challenges to such 'Article II removals' into the statutory review scheme." *Comey*, 2026 U.S. Dist. LEXIS 92589, *35. Notably, and consistent with the undersigned counsel's experience in handling federal disciplinary matters:

> Moreover, there is an apparent explanation for any gap between the Court's conclusion here and congressional purpose: As far as the Court can tell, when enacting the CSRA, Congress did not consider "Article II removals" of career civil servants because they were not a thing. The parties do not cite, and the Court

> has not found, any instance between the 1883 enactment of the Pendleton Civil Service Reform Act and the 1978 enactment of the CSRA in which the Executive Branch invoked standalone "Article II" authority to remove a career civil servant.

*Id*. at *21. *See also* Zaid Decl. at ¶6 (same).

To be sure, Ms. Pearson, like most FBI employees, are precluded – absent two exceptions which are not relevant to this proceeding – from pursuing a challenge to the MSPB of an FBI removal decision because Defendant FBI is exempt from the competitive service. *See* 28 U.S.C. § 536. Even when Congress amended the CSRA in 1990 to expand its jurisdiction for some of the excepted services, it still limited the protections afforded under subchapter II of chapter 75 for FBI employees because of the "sensitive missions" of those employees. *Hamlett v. Dep't of Justice*, 90 M.S.P.R. 674 at ¶15 (MSPB, 2002). It was also likely known that the "FBI's internal process for imposing adverse actions parallels the procedural protections outlined in the Civil Service Reform Act for more serious penalties even though it is not required to offer those protections to most of its employees." DOJ OIG ROI at 2. Most importantly for this discussion, and notwithstanding the preclusion from MSPB review, "[t]he Constitution and other laws … continue to apply to the FBI even though it is an excepted service agency." *Id*. at 2-3.

Both the Plaintiffs in *Comans* and *Comey* actually had the ability and legal right to bring their termination challenges to the MSPB, and in fact both did even while pursuing the same claims before a federal district court. *Comans*, 2026 U.S. Dist. LEXIS 93532, *4-5; *Comey*, 2026 U.S. Dist. LEXIS 92589, *12. That both of these federal employees had MSPB rights does not end the comparison to Ms. Pearson's circumstances even though she did not have similar rights. Indeed, it would seemingly make little sense for this anomaly to impact the analysis accorded in both *Comans* and *Comey* as to whether Article II terminations are in any way affected by the existence of the CSRA or not. "It follows that because the MSPB has no jurisdiction, this Court

necessarily has federal question jurisdiction over Plaintiff's due process claims because of the 'serious constitutional question that would arise if [the CSRA] were construed to deny any judicial forum' for those here." *Comans*, 2026 U.S. Dist. LEXIS 93532, *14 (*citing Coleman v. Napolitano*, 65 F. Supp. 3d 99, 104-05 (D.D.C. 2014)(collecting cases)).

Therefore, although Ms. Pearson is precluded by the CSRA from filing an appeal to the MSPB, she is not prohibited from pursuing her constitutional claims against the Defendants before this Court and should respectfully be permitted to proceed further.

## IV. THE CSRA DOES NOT BAR MS. PEARSON'S CONSTITUTIONAL CLAIMS

Additionally, this Court can still maintain jurisdiction over Ms. Pearson's constitutional claims because even if termination decisions rendered pursuant to Article II do not fall outside of the CSRA's scope, nonetheless the statute does not preclude her ability to have these claims adjudicated before a federal district court.

The Supreme Court has made clear that "federal courts are vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them" and "'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992), *superseded by statute on other grounds (quoting Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817–818 (1976)) and *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821). *See Slaughter* 2026 U.S. LEXIS 2877, *68 ("And our doctrines addressing Article III, the Due Process Clause, and the Seventh Amendment can help ensure that adjudications of private rights take place where they belong, before independent judges and juries.")(Gorsuch, J., concurring).

The CSRA codified a new framework for evaluating adverse personnel actions against federal employees. *See Lindahl v. OPM*, 470 U.S. 768, 773-74 (1985). There is no dispute that

this statutory review scheme by way of the MSPB divested district courts of jurisdiction over many claims brought by federal employees, even certain constitutional claims. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10-14 (2012). Nor is there any dispute that Ms. Pearson did not have MSPB rights. 5 U.S.C. § 7511(b)(8). But that is not the end of the debate. "[W]hether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)(internal citation omitted). In prior cases where the Supreme Court held that the CSRA precludes the invocation of federal question jurisdiction in the district courts it pointed to "the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions," and that led to the conclusion that "it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Elgin*, 567 U.S. at 11; *see also United States v. Fausto*, 484 U.S. 439, 443 (1988)(explaining CSRA "prescribes in great detail the protections and remedies applicable to such actions, including the availability of administrative and judicial review"). In *Fausto*, the Court described "the primacy of the MSPB for administrative resolution of disputes over adverse personnel action." *Id*. at 449.

To their credit, the Defendants disclose that, notwithstanding their primary arguments, "courts in our District have held that the CSRA does not preclude non-covered employees from bringing their constitutional claims." Defs' Memo at 7. *See, e.g.*, *Jewell v. Jagadesan*, 2026 U.S. Dist. LEXIS 50609 *7-8 (D.D.C. Mar. 22, 2026)(*quoting Graham v. DOJ*, 2002 U.S. Dist. LEXIS 27419, 2002 WL 32511002, at *3 (D.D.C. Nov. 20, 2002)("Although the CSRA precludes plaintiff from bringing his APA claims, his constitutional challenges to the Bureau's actions stand on a different footing."), *aff'd in part sub nom. Graham v. Ashcroft*, 2003 U.S.

App. LEXIS 16108 (D.C. Cir. Aug. 5, 2003)(per curiam), *and Graham v. Ashcroft*, 358 F.3d 931(D.C. Cir. 2004). *See also Lamb v. Holder*, 82 F. Supp. 3d 416, 422-24 (D.D.C. 2015)(same, collecting cases); *id*. at 423 ("Court finds it has subject matter jurisdiction to hear these constitutional due process claims under the grant of federal question jurisdiction in 28 U.S.C. § 1331."). *See also Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 371 (D.D.C. 2020)("[B]oth because of and despite the fact non-covered government workers lack any CSRA remedy, judicial review of claims related to CSRA-covered actions brought by such employees, *other than claims for equitable relief for constitutional wrongs*, is also precluded." (emphasis added). Courts require a "heightened showing" of Congressional intent before "construing [a statute] to deny any judicial forum for a colorable constitutional claim." *Elgin*, 567 U.S. at 9 (citation modified)(*quoting Webster v. Doe*, 486 U.S. 592, 603 (1988)).

In an attempt to overcome this acknowledged problem, the Defendants argue that these holdings cannot be reconciled with *Elgin* and *Fausto*. This is an understandable argument which is no doubt why Judge Nachmanoff directly addressed the issue in *Comans* in noting it did not trouble him because a "comparison to *Fausto* is inappropriate because the employees there brought a statutory, not constitutional, challenge." *Comans*, 2026 U.S. Dist. LEXIS 93532, *14 fn.3. Judge Furman similarly recognized the argument and rejected it: "The fact that Congress may not have even considered the possibility of Article II removals when enacting the CSRA also distinguishes this case from *Fausto*, upon which Defendants rely." *Comey*, 2026 U.S. Dist. LEXIS 92589, *22. *See* Defs' Memo at 4-8.

Constitutional claims are collateral to any review afforded by the CSRA and Article III courts may retain jurisdiction over employment claims of federal employees that raise constitutional challenges. *See Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984)(retaining

jurisdiction over allegation that officials responsible for reduction-in-force action held office in violation of Appointments Clause); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433-34 (D.C. Cir. 1996)(retaining jurisdiction over employee's First Amendment claim).

This Court should respectfully avail itself of the jurisdictional opportunity to adjudicate Ms. Pearson's constitutional claims.

**A. Ms. Pearson Retains A Protected Property Interest In Receiving Due Process Before Being Terminated For Investigated Or Proven Misconduct**

Defendants move to dismiss Ms. Pearson's Fourth Cause of Action (procedural due process claim) on the basis that she lacks a protected property interest. Defs' Memo at 13-18. Respectfully, the Defendants' Motion should be denied because Ms. Pearson has adequately alleged a property interest in being afforded due process before her FBI employment could be terminated based on the "overall workings" of the FBI's disciplinary system, which conditions dismissal on work-related reasons.

For the most part, the law governing this Cause of Action is not in dispute. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest … Only after finding the deprivation of a protected interest do [courts] look to see if the [government's] procedures comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). "For a property interest to be constitutionally protected by procedural due process, a person must 'have a legitimate claim of entitlement to it.'" *Langeman v. Garland*, 88 F.4th 289, 295 (D.C. Cir. 2023)(*quoting Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "A procedural due process violation under the Fifth Amendment occurs when a government official deprives a person of property without appropriate procedural protections." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020). Under *Perry v. Sindermann*, 408 U.S. 593 (1972), it "denotes a broad range of interests that are secured by

'existing rules or understandings,'" including where "mutually explicit understandings [] support a claim of entitlement to the benefit." *Id.* at 601 (*quoting Roth*, 408 U.S. at 577). The key inquiry is whether a plaintiff had a "legitimate expectation" to the benefit in question. *See Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988).

In public employment, a property interest arises when the government gives an employee "assurances of continued employment or conditions dismissal only for specific reasons." *Stone v. F.D.I.C.*, 179 F.3d 1368, 1374 (Fed. Cir. 1999). Such rights may stem from statutes or regulations. But they may also arise if the agency has "fostered rules and understandings [that entitle the employee] to believe that he would lose his job only for a job-related reason." *Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C. Cir. 1979).[6] At this stage, this is where the Parties' views differ.

Ms. Pearson never sought, nor was required to for purposes of her First Amended Complaint, to identify every rule or understanding that creates a property right for procedural due process protection, though several were identified. *See* FAC, ¶¶25-29, 47. She also alleged the concept that "Defendant FBI has fostered a mutually explicit understanding that an adverse employment action will not be summarily employed without due process." *Id.* at ¶47. Defendants, however, argue that none of what she cited to "qualifies as a source of a legitimate claim of entitlement." Defs' Memo at 14. Respectfully, the Defendants minimize the existence of Ms. Pearson's

---

[6] As was discussed above, many federal employees maintain a property interest in their employment by virtue of the CSRA, but not so for the majority of FBI personnel, such as Ms. Pearson. But that "do[es] not prevent the Bureau from giving its employees some security in their jobs." *Ashton*, 613 F.2d at 928. And that is exactly what Defendant FBI has done by adopting internal policies and procedures that effectively mirror the protections afforded by the CSRA. DOJ OIG ROI at 2. *See Mack v. United States*, 814 F.2d 120, 123 (2d Cir. 1987)("[I]t is true that even 'excepted service' public employees cannot be discharged for constitutionally impermissible reasons . . . .").

reliance on her property interest in ensuring she receives some form of constitutionally required due process before ever being terminated.

Ms. Pearson's employment, after two decades of unblemished service, was terminated without notice by Defendant FBI Director. Pearson Decl. at ¶¶3,7. The only reason given was that she allegedly "demonstrated unprofessional conduct". *Id*. at ¶7; Exhibit "1-A". Yet no details, much less due process opportunities for her to respond were ever provided. Pearson Decl. at ¶9. Because she reasonably relied upon the due process protections created expressly by Defendant FBI to afford her an opportunity to defend herself from impermissible actions, this Court should find that she possesses a constitutional property interest sufficient enough to deny the Defendants' Motion to Dismiss.

As DOJ's Inspector General has explained, "[t]he FBI has defined the actions that violate its standards of conduct, identified the range of discipline that it may impose when an employee commits misconduct, and developed a disciplinary process to address misconduct matters." DOJ OIG ROI at i; *see also* FAC, ¶29 (citing ROI). One of the relevant documents identified by Ms. Pearson is Defendant FBI's policy "Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process" ("Offense Codes"), *Id*. at ¶26. The Defendants, in arguing that it does not serve to create a property interest, attached a copy in support of their Motion to Dismiss. Defs' Memo, Ex. "A" at 2 (Dkt. 13-2). But Defendants attached a different *older* version dated 2017, which had been superseded by the time of Ms. Pearson's termination.[7] That

---

[7] To be fair, the 2017 version was the one cited by Ms. Pearson in her First Amended Complaint, FAC ¶26, but that does not relieve the Defendants from ensuring the correct, updated regulation was identified and provided to the Court for reference. The Defendants, who control access and possession of applicable regulations and policy documents, should respectfully first ensure all of the documents being discussed herein were actually in effect in January 2026 when Ms. Pearson was terminated.

fact alone calls into question the accuracy of the Defendants' arguments with respect to any of the documents relied upon for support of their Motion.

In the 2024 version, attached at Exhibit "3", it discusses circumstances where the FBI Director may impose a harsher punishment than what was actually proposed:

> Additionally, the Director and the Deputy Director have the authority to review and amend any disciplinary decision issued by OPR or through the FBI's appellate process if deemed necessary to correct an injustice or to prevent harm to the FBI. This authority may be exercised in favor of or to the disadvantage of the employee in question and includes the authority to deviate from the FBI's Offense Codes and Penalty Guidelines or other applicable policies as needed. For example, the Director or Deputy Director may decide to impose a more severe penalty, including but not limited to, suspension, reassignment, demotion, or termination. This authority does not constitute an additional level of appeal for an employee, it will not be routinely exercised, and it remains the sole province of the Director or the Director's designee.

*Id*. at 2. To be clear, Ms. Pearson does not dispute that there are procedural, internal FBI mechanisms that could permit an FBI Director to summarily terminate an employee, none of which were followed or relied upon in her situation, but those opportunities would occur *after* some level of due process steps transpire. The 2024 FBI's Offenses Code certainly suggests, if not states, that, and Ms. Pearson has relied upon this interpretation. Whether the FBI Director increases a punishment to the termination level follows the issuance of a "disciplinary decision issued by OPR or through the FBI's appellate process". *Id*. That never happened in Ms. Pearson's case as she was never afforded any opportunity to be afforded due process.

Other guidance documents relied upon by Ms. Pearson includes the Office of Professional Responsibility Policy Guide ("OPR Policy Guide") which establishes a multistep procedural mechanism for investigating and adjudicating misconduct claims. FAC, ¶27. The Defendants have submitted that policy into the record. Defs' Memo, Exhibit "B" (Dkt. 13-3). If an offense code violation is substantiated, a penalty is determined after considering the twelve factors

identified in the leading MSPB case on imposing disciplinary actions – *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981). OPR Policy Guide at *passim* (multiple citations to application of *Douglas* factors); Offense Codes at 3. This process "parallels the procedural protections outlined in the Civil Service Reform Act for more serious penalties." 2021 DOJ-OIG Report at 2. This highly reticulated disciplinary scheme provides "substantive provisions" that specify "particularized standards or criteria [to] guide … decisionmakers" seeking to remove an FBI employee. *Griffith v. F.L.R.A.*, 842 F.2d 487, 495 (D.C. Cir. 1988)(citation omitted). Significantly, those provisions do not authorize the FBI to dismiss employees for any reason. Rather, they authorize dismissal only for offenses identified in the Offense Codes. As a result, FBI employees have a legitimate expectation that dismissal for misconduct will rest on cause, not for no reason at all.[8]

Both the OPR Policy Guide and Offense Codes directly address summary dismissals and limit the authority of the FBI Director to four situations when such a decision would demand such "an extraordinary remedy," Offense Codes at 3: "When: (a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent considerations are at stake". *Id.*; OPR Policy Guide at 8. Given the facts of this case, which must be relied upon as accept at this stage, it does not appear reasonable that Ms. Pearson's termination for "unprofessional conduct", Exhibit "1-A", would neatly fit into one of those categories, if at all, especially since she had no advance warning, no disciplinary history and no

[8] FBI personnel may be dismissed for other job-related reasons besides misconduct, including unacceptable performance, national security concerns, or inability to perform the essential duties and responsibilities of their position. But as with misconduct, the Bureau has adopted written policies that delineate permissible bases for such removals and establish the processes that must be followed, which employees such as Ms. Pearson have come to rely upon. *See generally* Performance and Development Program Policy Guide (June 8, 2020), FBI Human Resources Division, attached at Exhibit "4".

one could explain to her why this action had happened. Pearson Decl. at ¶¶8-9. *See also e.g., Vanover v. Hantman*, 77 F. Supp. 2d 91, 102-03 (D.D.C. 1999)(protected property interest based, in part, on "elaborate disciplinary procedure" calling for "progressively stringent" discipline), *aff'd on other grounds*, 38 Fed. Appx. 4 (D.C. Cir. 2002); *Conley v. Bd. of Trs. of Grenada Cnty. Hosp*., 707 F.2d 175, 180 (5th Cir. 1983)(property interest created by guidebook that lists thirty-six violations that may warrant dismissal). *See also Souther v. Patel et. al.,* Civil Case No. 25-150-SCJ (slip op., June 17, 2026, N.D.Ga.), attached at Exhibit "5 (FBI employee pled sufficiently to demonstrate property interest in employment in reliance of "existence of any past practices, employment handbooks, letters of appointment, or understandings from which an expectation of job tenure might arise." *Painter v. FBI*, 694 F.2d 255, 257 (11th Cir. 1982)). *Cf. Arnett v. Kennedy*, 416 U.S. 134, 167 (1974)(Powell, J., concurring)("While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.").[9]

---

[9] Defendants' reliance on *Langeman*, while understandable, is misplaced. Defs' Memo at 16. There an FBI employee who had been summarily dismissed argued he had a "property right in his continued employment" because of a 1997 Memorandum by Former FBI Director Louis Freeh, which is not at issue in this case and is outdated. 88 F.4th at 294. While the Circuit did conclude that the memo "does not contain explicit mandatory language, but instead reserves 'expansive authority and discretion' for FBI leadership to determine the circumstances where an FBI employee may be summarily dismissed." *Id*. at 295 (*citing Crooks v. Mabus*, 845 F.3d 412, 419 (D.C. Cir. 2016)), Ms. Pearson is not claiming that Defendant FBI lacks an ability to utilize summary dismissals under appropriate circumstances. But the internal governing rules and policies do not permit summary dismissal without some meaningful cause. Nor did the Circuit consider the other rules and policies raised by Ms. Pearson to create a property right in receiving procedural due process before she can be terminated. As explained above, the relevant policies provide for summary dismissal only where "(a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent considerations are at stake." Offense Codes at 3; OPR Policy Guide at 8. This language supplies sufficient "substantive limits" on official discretion to dismiss an employee to give rise to a property interest. *See Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997).

If anything, the above arguments should be deemed initially sufficient to support a premise that Defendant FBI's discipline policies create enough of a property right in procedural due process to merit discovery.[10]

**B. Ms. Pearson Has Alleged Sufficient Facts To Support Proceeding To Discovery On Her First Amendment Claim**

Ms. Pearson agrees with the Defendants that claims of unlawful retaliation are analyzed under a four-part test, otherwise known as the *Pickering* test as a result of *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), "to determine if a public employee's termination violated his First Amendment rights." *LeFande v. District of Columbia*, 613 F.3d 1155, 1158 (D.C. Cir. 2010). Specifically:

> First, the public employee must have spoken as a citizen on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that her speech was a substantial or motivating factor in prompting the retaliatory or punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

*Id*. at 1158–59 (*quoting Wilburn v. Robinson,* 480 F.3d 1140, 1149 (D.C. Cir. 2007)). "The first two factors under the *Pickering* test are questions of law for the court to resolve." *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994); *see also Connick v. Myers*, 461 U.S. 138, 147-48 & n.7 (1983)("Whether an employee's speech addresses a matter of public concern must be determined

---

[10] For example, discovery would seek, among other things, to: (1) identify all relevant and current documents describing the agency's dismissal policies, including guidance from supervisors and internal memoranda and e-mails; (2) determine what representations the FBI makes about job security in recruiting and retaining employees; and (3) explore whether the FBI has ever used, or purported to use, summary dismissal without finding misconduct or engaging into some sort of investigation or fact-finding efforts. These critical issues (and others) cannot be conclusively determined based on the pleadings alone. *See e.g., McCabe v. Barr*, 490 F. Supp. 3d 190, 221 (D.D.C. 2020)(ordering additional discovery on procedural due process claims). *See also Strzok v. Garland*, 2025 U.S. Dist. LEXIS 192975, *10 (D.D.C. Sept. 23, 2025)(discovery permitted; plaintiff received notice and opportunity to be heard before fate was decided).

by the content, form, and context of a given statement," and is a question of "law, not fact."). *See e.g., Elrod v. Burns*, 427 U.S. 347, 352 (1976)(plurality op.)(rejecting contention that recognizing First Amendment political-association claims by federal employees would interfere with "the executive's responsibility to ensure that the laws be faithfully executed" because "there can be no impairment of executive power . . . where actions pursuant to that power are impermissible under the Constitution").

While candidly Ms. Pearson's First Amended Complaint is not as detailed as would normally be preferred, it is also true that the Defendants are more than aware of who the "former senior FBI official" is and what the "matter of public concern" refers to, but there are reprisal/retaliation concerns that exist at this early stage that countenance against public disclosure at this juncture. Given that Ms. Pearson believes that Defendant Director Patel's exercise of Article II authority was unlawful and as a result will not necessitate this Court having to rule on her First Amendment claim at this time, she will ask for the Court's discretionary indulgence. Of course, the name of the individual and the details surrounding the claims would be openly disclosed during discovery, which hopefully would be permitted with respect to her other causes of action. Once the information is disclosed through that process, Ms. Pearson would be willing to file a Second Amended Complaint with the details and the Defendants could seek dismissal through summary judgment (or another Motion to Dismiss).

Alternatively, if the Court does not view ruling on the Defendants' Motion to Dismiss as being moot, Ms. Pearson will seek leave to file a Second Amended Complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Of course, the grant or denial of leave lies in the sound discretion of the District Court. *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)(per curiam). The Court would, however, heed Rule 15's mandate that leave is to be freely

given when justice so requires. *See Mouzon v. Radiancy, Inc.*, 309 F.R.D. 60, 64 (D.D.C. 2015). Indeed, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 182 (1962).

**C. Ms. Pearson's Derivative Claims Should Not Be Dismissed At This Time**

Defendants seek dismissal of Ms. Pearson's declaratory judgment and mandamus claims in Counts VI and VII. Defs' Memo at 18-20. For the reasons set forth above, *see supra*, Ms. Pearson has properly stated a sufficient claim to initially survive a Motion to Dismiss.

## CONCLUSION

For the reasons outlined above, this Court should respectfully grant Ms. Pearson's Cross-Motion for Partial Summary Judgment and declare Defendant Director Patel's termination memorandum to have been unlawful thereby reinstating her to the position for which she was terminated retroactive to January 30, 2026 (with appropriate backpay and restoration of all other commiserate rights and privileges). That result would then allow for the Court to deny the Defendants' Motion to Dismiss without prejudice as moot. Alternatively, this Court should respectfully hold that it retains jurisdiction over Ms. Pearson's claims and then still deny the Defendants' Motion.

Date: July 15, 2026

Respectfully submitted,

/s/ *Mark S. Zaid*

Mark S. Zaid, Esq.
D.C. Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20036
(202) 498-0011
Mark@MarkZaid.com
Brad@MarkZaid.com

Attorneys for the Plaintiff